P. WARE, JR., ET AL., *v.* JOHN WANLESS ET AL.

ASSIGNMENT.—A provision in an assignment which reserves any of its assets to the debtor before full payment of creditors, vitiates the instrument whether the reservation be provided for by coercive terms or not.

IDEM.—An assignment which contains coercive terms, whether their aim is to provide a reservation or not, vitiates the instrument *a fortiori,* if they do aim at a reservation. The debtor cannot prefer himself to the creditor in respect to the assets, and a provision in the assignment which tends to secure, is a provision which does not secure that preference, but renders the assignment void.

FRAUD.—Where an assignment exhibits on its face constructive fraud, that feature cannot be overcome by proof that there was no fraud in fact, and parties to the instrument are estopped from alleging good faith against its import; fraud in law is as fatal as fraud in fact, and equity will not sever the elements of fraud from the instrument, and give effect to the rest. The rule at law and in equity, is to treat the assignment, if fraudulent, as void *in toto.*

APPEAL from the District Court of Albany County.

The facts are stated in the opinion.

*Johnson & Potter, C. W. Bramel* and *I. P. Caldwell,* for appellants.

Judgment creditors stand in a position to dispute the validity of the assignment, and call upon the equity arm of the court for the interference with the assignment sought, and the relief prayed for by them. Burrill on Assignments, page 597. The assignment is void as to the complainants, for two reasons:

1.—The coercive provision whereby creditors must release all or receive nothing.

2.—The resulting benefit to the assignor in case the creditors refuse to be coerced.

Whereby the assignment upon its face appears to be an assignment for the benefit of the assignor, instead of an

assignment for the benefit of creditors, and a fraud in law. Burrill on Assignments, pages 156 to 196; Id., 394 to 432; Id., 435 to 448; *Howell* v. *Edgar*, 3 Scam., 417; *Hardin* v. *Osborne*, 60 Ill., 93; *Barney* v. *Griffin*, 2 N. Y., 365; *Ingraham* v. *Wheeler*, 6 Conn., 277; *Atkinson* v. *Jordin, Ellis & Co.*, 5 Ohio, 289; *Brown* v. *Knox*, 6 Mo., 302; *Gardner* v. *Cole*, 21 Iowa, 205; 5 Cow., 547; *Glover* v. *Wakeman*, 11 Wend., 187; *Brashear* v. *West*, 7 Pet., 608; *Tutt, Bros. & Co.*, v. *Caldwell*, 3 Minn., 364; *Coolidge* v. *Melvin*, 42 N. H., 510; *The Watchman*, Ware, 232; *Stewart* v. *Spencer*, 1 Curtis, 157; *Compton* v. *Gilbert*, 5 McLean, 117; *Miller* v. *Conklin*, 17 Ga., 430; *Burk* v. *Murphy*, 27 Miss., 167.

An assignment void in part is void *in toto*, and creditors are entitled to proceed from the point at which they were stopped by the assignment. Burrill on Assignment, 600–601; *Sheriff* v. *Manning*, 2 Mich., 446; *McClurg* v. *Leckey*, 3 Penrose & Watts, 83; *Goodrich* v. *Downs*, 6 Hill, 438; *Austin* v. *Bell*, 20 John, 441; *Hysolph* v. *Clarke*, 14 John, 458.

*Brown & Brockway*, for appellees.

It may be that the deed of assignment is ambiguous, and uncertain in its terms; and if it is, it may be explained by oral testimony, or helped by the ordinary rules of construction, and will be so construed as to make it available for the purpose intended, rather than to destroy it. See Burrill on Assignments, page 374 and note; 22d Wendell, 483 and 488; *Coverdale* v. *Wildee*, 17th Pickering, 181; 11th Wendell, 187 and 192; 15th Barber, 618.

A deed of assignment is not void because it tends to hinder, delay, etc., under the statute of Elizabeth; it must have been made with *intent* to hinder, delay, and defraud, etc. See Burrill on Assignments, pp. 408, 409 and 410.

Where the deed is fraudulent "in fact,"—it is quite generally held void "in toto,"—and not good for any purpose whatsoever; but there is a very important distinction

between deeds fraudulent "in fact" and fraudulent by "construction." See 2 Tucker's Com., [443] 432.

Where fraud may arise "constructively" from one provision in a deed only, and is not clear and certain, oral testimony may be offered to explain or qualify it. See Burrill on Assignments, secs. 345 and 346, 18 Ala., 741; *Green* v. *Banks*, 24 Tex., 508; *Cunningham* v. *Freeborn*, 11 Wend. 240. Deeds constructively fraudulent, because of some bad provision, may be void in part, and valid as to all the rest. See *Pinneo* v. *Hart*, 30 Mo., 561; *Keyser* v. *Heavenrich*, 5 Kan., 324; *Macintosh* v. *Corner*, 33 Md., 607.

The only pretence of fraud in this case arises from a single paragraph in the assignment, found on page 99 of the record, from which it is claimed there is an effort to hinder, delay, and coerce the creditors of the assignor, and for that reason is fraudulent and void at common law.

If the paragraph referred to can be so construed, then we say it is not fraudulent and void at common law, but such stipulations for release are approved by the common law, and assignments containing the same are adjudged valid. See Burrill on Assignments, pp. 408, 409 and 410, and notes; also page 156; *The King* v. *Watson*, and *James* v. *Whitehead*, there cited. It appears that stipulations for release, under statute of Elizabeth, always have been, and are now, adjudged valid in England. See Burrill, 156, above cited. Our legislature, in adopting the common law of England, include statute of Elizabeth as a part thereof. See Compiled Laws of Wyoming, page 193.

In adopting the common law of England as the rule of decision in Wyoming, they follow the rule of courts—*i. e.*: "When a state adopts the statute of another state, it also adopts the construction given thereto by the courts of that other state." See *Barnes* v. *Rettew*, 8 Phila., 133; *Rosvelt* v. *Marks*, 6 Johns. Ch., 266. Our court is bound, then, to follow the English decisions as their rule and guide in this case. See authority before cited, and *Livermore* v. *Bagley*, 3 Mass., 487; 6 Johns Ch., 52; *Tucker* v. *Okley*, 5 Cranch, 34.

But if you come to the United States for a construction of this statute, or to learn the common law, then we say that all cases, or nearly all, decided purely under a statute like ours, (the old statute of Elizabeth), hold that stpiulations for release as a condition precedent to sharing in avails of assigned estate, are valid.

Among the states that hold with English decisions upon this question are: Maine, New Hampshire, Connecticut, Vermont, Rhode Island, Massachusetts, New York (prior to passage of Statute of Trusts), Pennsylvania, Virginia, North and South Carolina, and other states.   10 Watts, 309, *Bayne* v. *Wylie*, (Penn.); *Kevan* v. *Branch*, 1 Grattan, 274; *Pearpoint* v. *Graham*, 4 Wash. C. C., 232 (Virg.); *Niolon* v. *Douglas*, 2 Hills, Ch., 443; *LePrince* v. *Guillemont*, 1 Richardson's Equity, 187 (S. C.), and *Aiken* v. *Price*, Dudley, 50 (S. C.); *McCall* v. *Hinckley*, 4 Gill, 128, (Maryland); *Robinson* v. *Rapelye*, 2 Stewart, 86; *Rankin* v. *Lodor*, 21st Alabama, 380, and Id,, 389; *Halsey* v. *Whitney*, 4 Mason, 206, 229 (Mass.); *Nostrand* v. *Atwood*, 19th Pickering, 281 (Mass.); *Hall* v. *Denison*, 17 Vermont (2 Washburn), 310; *Havens* v. *Richardson*, 5 N. Hamp., 113; *Fox* v. *Adams*. 5 Greenleaf, 245; 6 Id., 395; 2 Fairfield, 41 (Maine); *Dockray* v. *Dockray*, 2 Rhode Island, 547.   And where the stipulation is a condition of preference only, the great weight of American authority sustains them.   Burrill on Assignments, 2nd edition, page 173; 2 Kent's Com., 534, 693 and 694.   Also 2nd edition Burrill on Assignments, pp. 156 to 173, inclusive.

Stipulations in deeds of assignments that have sometimes been held void, are such as make the right to share in the avails of the estate depend wholly upon execution of release, and the share going to such creditor, if he fails to execute release, to be paid back to assignor.   For form of such release, see 2 Ed. Burrell on Assignments, pp. 156, 389, 390 and 642.

It will be seen from the form given by Burrill, that a stipulation, much stronger than the one in this assignment

(if this assignment contains a stipulation), is construed to be a *preference* of creditors only; and it also appears from the evidence in this case that this assignment was intended to prefer certain creditors by the stipulation, or what is called a stipulation, therein.

The worst that can be said of this assignment, is that it is ambiguous and uncertain, and, therefore, open to construction and explanation. Under such circumstances all the surroundings will be considered, and if there was no intent to defraud, and no wrong done by reason of the assignment, under rules of construction before cited, the assignment must be declared good. See 2 ed. Burrill, page 374.

It appears by the evidence in this case that all the debts of Wanless amount to about $37,000. That creditors accepting assignment hold about $34,000 of that indebtedness. That the claims of the complainants herein amount to about $3,000, more or less. The assignment is good as to those accepting. Burrill, page 447. What is it complainants ask? They ask to be paid in full. The evidence shows that the probable avails to be distributed are about $7,000.00 more or less. Deduct from that $3,000, claimed by plaintiffs, and we have $4,000, to divide pro rata on $34,000.00. The parties accepting assignment are bound and must release, (if the court sustains complainants), for this small percentage, while the complainants are paid in full. There can be no equity in this, and when so much has been done under an assignment, courts of equity will go far to sustain it, because greater wrong will result from holding it bad. *Lippincott* v. *Barker*, 2d Binney, 174; Burrill, 169, and 170, 2d edition.

But the evidence in this case shows that at and on the date of the assignment none of these complainants were judgment creditors, but obtained these judgments thereafter, and that these judgments were never liens on the property in hands of the assignees. None but judgment creditors can assail an assignment, although fraudulent and

void. 2d ed. Burrill on Assignments, page 597. And they must have taken out execution and made it a lien on property assigned. *Mohawk Bank* v. *Atwater,* 2 Paige, 54; See also, 1 Denio, 190, *Hastings* v. *Belknap*; *Reubens* v. *Joel,* 3 Kernan, 488; *Berryman* v. *Sullivan,* 13 Smedes & Marsh, 65; *Caswell* v. *Caswell,* 28 Maine, (15 Shepley), 232; *Fox* v. *Willis,* 1 Manning, (Mich.), 321; 6 English, (Ark.) 411.

Under case made the complainants cannot maintain this action and have no rights in the premises; clearly not unless judgments obtained after deed was made without lien are sufficient.

PECK, J. Upon the first hearing of this appeal we were clear and unhesitating in our judgment, that it should be sustained. We have carefully attended to the diligent and earnest argument, made by the learned counsel of the appellees on the second hearing, but our judgment is unchanged; if there is a difference, it has been confirmed.

This is a bill in favor of the appellants against the appellees, brought in the second district court to vacate an assignment, made by Wanless to Fillmore and Hayford, as a fraud upon the Orators as creditors of Wanless, and to obtain satisfaction of their claims out of the property, delivered to the assignees under the assignment, and for general relief. Wanless did not defend; the assignees answered, the Orators replied, and proofs were taken. Upon the pleadings and proof, the district court passed a decree sustaining the assignment, denying the relief asked for in the bill, and allowing to the defendant costs; from which decree the Orators have appealed.

It is objected that the decree has not been excepted to, and therefore is not open to revision. The notice of appeal is an exception, bringing before us the merits of the decree, as the decree was against the equity claimed in the bill upon a matter of fact, alleged therein, conceded by the answer, and established by the proofs. In the body of the

decree, between the recital of the facts found by it,—among which are the conclusions that the assignment was not made to defraud, or to hinder or delay creditors,—and the decretal order is this clause, namely; "against which (meaning the conclusions of fact) no final objection is made by complainants." The learned counsel for the appellees very intelligently claims nothing from the clause; it is as meaningless as it is novel, and we infer that it was inconsiderately inserted by the draftsman, and overlooked by the judge when he signed the decree. The Orators were not bound to anticipate an adverse decree, might not know of it when rendered, and were not obliged to notice till filed; then the necessity and right of exception to it commenced; as a prior objection would have been premature, the omission to make it was insignificant.

The case establishes the following facts. On the 17th day of December, 1875, Fillmore and Hayford received from Wanless a written assignment of all his assets, consisting of merchandise, furniture, demands and real estate, for the benefit of his creditors; the assignment contained full power for the conversion of the assets, and deduction for expenses and services prior to distribution, also a dividend clause, of which a copy is set forth below. The property was forthwith delivered under the assignment; and, as inventoried in it, amounted to $19,510.88; the liabilities as stated in it, exclusive of interest, to $36,692.64; the assignees admit that they received assets of the actual value of $18,807.12; the liabilities were, exclusive of interest, nearly $44,000. The assignees have realized from the assets in cash $10,907.97, and they put their services and expenses, past and future, under the assignment at the maximum of $4,118.17; acknowledging a net in their hands of $6,789.80. When the assignment was executed, Wanless was indebted to each of the Orators; and for that indebtedness they severally obtained judgments in that court as follows: P. Ware, Jr., & Co., on the 9th day of February, 1876, for $968.31 damages and costs; Copeland and Hartwell

on the same day for $367.89 damages and costs, and the Wyoming National Bank on the 28th day of April, 1876, for $1,178.61 damages and costs.

On the first two judgments executions were duly taken out and delivered to the proper officer, who demanded of the assignees sufficient property for their satisfaction; the demands were refused, and subsequently the processes were duly returned " no property found; " it does not appear that any execution was issued on the third judgment. The assignees refused to comply with the demand so made upon them under the executions, claiming that their title to the assets was paramount, and upon this claim they resist the bill. Since the execution of the assignment the real estate has been in litigation, and unavailable, as assets; the cash realized was from the personal property. Proofs were introduced by the defendants, and against due objection, if objectionable, to show that the assignment was executed and received, and that the assignees had discharged the trust in good faith. Neither of the Orators has assented to the assignment. The dividend clause is as follows: " and by and with the residue or net proceeds and avails of such sales and collections, the said parties of the second part shall first pay and discharge in full the several and respective debts, notes and sums of money due or to become due, or for which they or either of them are sureties from the party of the first part to the parties of the second, the said several sums and persons or firms being fully described in a schedule hereto attached marked schedule ' B.' Second, by and with the remainder of said net proceeds and avails, the said parties of the second part shall pay and discharge all other debts, demands and liabilities whatsoever now existing, whether due or hereafter to become due, provided such remainder be sufficient for that purpose, and if insufficient, then the same shall be applied pro rata, share and share alike to the payment of said debts, demands and liabilities, according to their respective amounts, and the person or persons, company or corporation, creditors as aforesaid,

shall receive and receipt the same in full discharge and release of their respective claims, debts or demands."

Between the drafting and the execution of the instrument, claims, which were intended to compose the preferred class B., were satisfied, so that, when the instrument was executed, all the creditors for whom it provided were nominally of the second or residuary class, as the classes were designated in the document, but which thus becomes the sole class.

The English common law in its enlarged sense, as embracing law and equity, became by the principle of colonization the fundamental jurisprudence of the American colonies, so far as it was adapted to their several conditions; when the colonies renounced their allegiance to the British government, and passed into states, that law with that limitation became the fundamental jurisprudence of the states. When the latter formed the Federal constitution, they embraced this law in the judicial power, which that instrument confers upon the Federal government, and thus under the constitution and anterior to statute it prevails, with the exceptions hereinafter stated, throughout Federal limits, as a basis of Federal authority; remaining in abeyance, until courts are provided by statute for its administration—for the states, under Art. 3, sec. 5, providing that the judicial power of the United States shall be vested in one supreme court, and in such inferior courts, as Congress may establish —and for the territories, under that provision, and the further provision of Art. 4, sec. 3, requiring Congress to make all needful rules and regulations respecting the territories. That exception is of Louisiana and Florida, and arises under the principle of cession and the provisions of treaty.

This common law, on which the constitution is predicated, necessarily is not a compound of the law, as it applied in the several states at the adoption of the constitution, because the original had undergone changes by local usage and adjudication, in the process of its adaptation to

colonial conditions. Necessarily it is that unit of law, which prevailed in England—the English common law proper. And it was that law, as it stood manifested by English decisions, at the date of the Declaration of Independence, because till then appeals lay from the colonial courts to the King's bench, and from that tribunal to the House of Lords, where controlling decisions became, down to that period, the authoritative exposition of the law, and its conclusive evidence. But it was that English common law proper, as applicable to our condition as the American people. The organic act of the territory declares at section 16 : "That the constitution and all laws of the United States which are not locally inapplicable, shall have the same force and effect within the said territory of Wyoming, as elsewhere within the United States," and at section 9 : "That the supreme and district courts, respectively, shall possess chancery as well as common law jurisdiction and authority for redress of all wrongs committed against the constitution or laws of the United States, or territory, affecting persons or property." Thus the act in form, and with unmistakable explicitness affirms, and, if a statute is necessary to that end, establishes the existence of the common law in its enlarged sense as the general and fundamental jurisprudence of the territory—subject to the limitations yet to be mentioned—and provides the courts, through which that law is to be administered. Section 6 declares that the legislative power of the territory extends to all rightful subjects of legislation, consistent with the constitution and the act; hence the only limitations upon the common law, as the jurisprudence of the territory, are the Federal constitution and statutes; territorial legislation cannot change it. British statutes declaratory of the common law, applicable to the national condition, and enacted before the severance of the mother government, enter under these organic provisions into the law of the territory.

For the general reason that the adoption of a foreign

statute includes the construction put upon it by the courts of the foreign government; and for the special reason that the English courts, down to that event, are .the sole and supreme evidence of the common law—the construction given to those statutes by the English courts before the revolution also enter, under these organic provisions, into the law of the territory.

Section 17 of the act, declares that the statutes of Dakota, in force in Wyoming at the taking effect of this act, shall continue in force, until repealed by the legislature of Wyoming.   But the organic act of Dakota contains the same provisions as to the common law, which are in the organic act of Wyoming; therefore there can be no Dakota statute, that affects the last mentioned provisions.   The act of December 2, 1869, entitled " An act adopting the common law of England and certain declaratory and remedial statutes of said kingdom," at page 193 of the compilation, provides that " The common law of England, as modified by judicial decisions, so far as the same is of a general nature, and not inapplicable, shall be the rule of decision in the territory."   As the office of a decision is not to make, but simply to explain the law, and a decision can be nothing but evidence of the law, the term " modified," in the statute, is synonomous with the term " expounded," and, though the decisions are not named, nor the period covered by them specified in the statute, the reasonable intendment is the English decisions, and the period ending with July. 4, 1876 ; so understood and read, this provision merely reiterates the provisions of the organic act upon the subject.

The statute of December 2nd, next provides that declaratory statutes shall be rules of decision in the territory; if by this is intended statutes declaratory of the common law previously mentioned in the statute, and passed before the revolution—and so we understand its intention—it simply reiterates the provisions of the Organic Act upon the subject.   It is not necessary to consider, and we do not consider the residue of this statute.   It follows that the common law governs the assignment.

The 13 Eliz. C. B. excepting the absolute parts, also the third, which is the penal section, is as follows: "For the avoiding and abolishing of feigned, covinous and fraudulent feoffments, gifts, grants, alienations, conveyances, bonds, suits, judgments, and executions, as well of lands and tenements as of goods and chattels, more commonly used and practiced in these days, than hath been seen or heard of heretofore; which feoffments, gifts, grants, alienations, conveyances, bonds, suits, judgments and executions, have been and are devised and contrived of malice, fraud, covin, collusion or guile, to the end, purpose and intent to delay, hinder or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures, heriots, mortuaries and reliefs; not only to the let or hindrance of the due course and execution of law and justice, but also to the overthrow of all true and plain dealing, bargaining and chevisance between man and man, without the which no commonwealth or civil society can be maintained or continued.

"Be it therefore declared, ordained and enacted, by the authority of this present parliament, That all and every feoffment, gift, grant, alienation, bargain, and conveyance of lands, tenements, hereditaments, goods and chattels, or of any of them, or any lease, rent, common or other profit or charge out of the same lands, tenements, hereditaments, goods and chattels, or of any of them, by writing or otherwise; and all and every bond suit, judgment, and execution, at any time had, made, since the beginning of the Queen's Majesty's reign, that now is, or at any time hereafter to be had or made, to or for any intent or purpose before declared or expressed, shall be from henceforth deemed and taken, (only as against that person or persons, his or their heirs, successors, executors, administrators, and assigns, and every of them, has in actions, suits, debts, accounts, damages, penalties, forfeitures, heriots, mortuaries and relief, by such guileful, covinous, or fraudulent devices and prac-

tices, as is aforesaid, are, shall, or might be in any wise disturbed, hindered, delayed or defrauded,) to be clearly and utterly void, frustrate and of none effect; any pretence, colour, feigned consideration, expressing of use, or any other matter or thing, to the contrary notwithstanding.

" 6. Provided also, and be it enacted by the authority aforesaid, That this act, or anything therein contained, shall not extend to any estate or interest in lands, tenements, hereditaments, leases, rents, commons, profits, goods, or chattels, had, made, or hereafter to be had, made, conveyed or assured, which estate or interest is or shall be upon good consideration, and bona fide law, fully conveyed or assured to any person or persons, or bodies, politic, or corporate, not having at the time of such conveyance or assurance to them made, any manner of notice or knowledge of such covin, fraud or collusion as is aforesaid; anything before mentioned to the contrary hereof notwithstanding."

This transcribed portion of the statute is declaratory; is then not a newly created narrow rule, but the expression of a pre-existent principle, flexible to every case coming within its reason; and is as operative within the territory, as it is in England. We read the common law in the statute. Summarizing that law on the subject of fraudulent conveyances, it enumerates every form of transfer and every description of property, includes all conditions of assets, exempts no debtor; and condemns every transfer, into which enters a fraudulent design and delay, at the instance of a dissenting creditor. It follows, as a comprehensive principle, that the assets of the debtor are so far charged with the payment of his debts, that the law will frustrate any disposition which has been made of them with that design, and reclaim them for the creditor; that it is immaterial whether the debtor be solvent or insolvent; the assets transferred the whole, or but a part of his estate; or whatever be the form of transfer, or whether the intent be latent or potent, actual or constructive; the purpose is the index, that a *bona fide* and therefore valid transfer may

hinder and delay the creditor, and it is *bona fide*, when the hindrance and delay are merely incident to a place, which contemplates the entire devotion of those assets to the satisfaction of every claim according to its terms, the unconditional preference of the creditor over the debtor; but that the transfer is fraudulent and the repose voidable, when the hindrance and delay are incident to a place, which tends to swerve this attitude of the debtor and creditor, towards those assets, and which therefore, if upheld, necessarily embarrasses the latter's right to reach the property by legal process; for it is in that tendency that the law sees the fraud, and therefore the intent to commit it necessarily treats the tendency to work the result as conclusive of an intent to accomplish it. The law permits the preference of one creditor to another, but not if it involves a preference of the debtor to a creditor. Is this assignment obnoxious to the statute?

The dividend clause clearly provides that, in case of a deficiency of assets, the creditors shall receive and receipt in release of the balance of their claims; the assignees can pay only on that condition; the creditor must elect to assent or dissent before or on offer of the dividend; his acceptance works a release with or without receipting; paying without receipt, would be an excess of authority in the assignees and of right in the creditors, but would enure to the debtor as a discharge—the receipt being, not the discharge, only its evidence.

The proper interpretation of the clause is that, a creditor dissenting, either no dividend is to be made, and the entire net of the assets,—or only his *pro rata* passes into the surplus fund; the first of these alternatives is the proper construction, if the text is to be taken literally, because literally the assignees are directed, the assets being short, to make one sale of them, and with it to pay all the creditors, and all must receive the portion in full; and we think that the latter expresses the will of the assignor, for without applying, and certainly by applying the strict construction, that

is appropriate to an insolvent's assignment. We think that his purpose clearly was to obtain a full discharge, or to keep the property; his will would govern the assignees so that they could neither change the rate by paying the dividend of a dissenting to an assenting creditor, nor pay one, without paying all. Whichever of the two interpretations applies, the principle is the same in the direct tendency of the assignment to hinder, delay and defraud creditors; sustain it, and the creditor is placed in the power of the debtor, whose will becomes coercive; assenting or dissenting, his right is sacrificed; he is constrained to the choice of relinquishing an unpaid balance, for the sake of getting a dividend, however nominal, or of foregoing the dividend in order to protect the balance; of abandoning one part to save the other, though both parts are equally due. Thus the debtor can either secure a bankrupt's discharge upon his own terms, or retain his property, and with such a power would never fail to shape his assignment accordingly, and the stimulus to prefer himself to his creditor would be increased just in proportion to the desperateness of his condition. Thus the theory of a lawful assignment would be completely reversed, for its primary purpose would be to promote the interest of the debtor to the right of the creditor, and the law would be turned into a rule, not for the protection of the latter, but for the escape of the former.

It is insisted that a proper interpretation requires the dividend of a dissenting creditor to be paid to the assenting creditors, until they shall have been paid in full; that the dividend clause would thus operate as a preference among creditors. The clause, so interpreted, would so operate, but that preference would involve a preference of the assignors over the dissenting creditors; and the assignment would lead to the same effect, and be open to the same objection, attributable to either of the two interpretations, which we alternatively give to the dividend clause; for on the one hand the motive to refuse would be common to all the creditors, and on the other the total of the rejected and

the total of the paid dividends might exceed the total of the claims of the seeming creditors,—and so in either case the direct tendency would be to create rejected dividends for the surplus. Fraud is none the less fraud, that it takes a circuitous path; it is the duty of the law to track it out, and stop it, whatever may be its path.

The counsel for the defense informs us that the English reports contain no case prior to 1791, condemning such an assignment; but that counsel has produced to us no case in those reports, we have searched and found none, and we believe that none exists before that date, sustaining such an assignment; the absence of a sustaining decision is most significant that until that date the law in England was held to be the other way; and its explanation is to be found in the simple fact that the statute was at its date the supreme evidence of the state of the law, and the continued existence of the statute is conclusive of the continued existence of the law, for the attempt of an English court to sustain such an assignment would be an attempt to nullify the statute.

The appellees rely upon the cases of *Jackson* v. *Lornes*, 4 T., 166, decided in 1791, and *Rex* v. *Watson et als.*, 3 Peire, 6, decided in 1816, as justifying such assignments at the common law. In *Jackson* v. *Lornes* the debtor, his assignee and some creditors executed an assignment, conditioned for a release on the payment of such dividend as the assets would yield, and the contract was thus valid as to the parties; one of the creditors signed upon a secret agreement with the debtor for the payment conditionally of his entire claim, subsequently sued the debtor upon the secret agreement, and the latter defended, and obtained judgment on the ground of the fraud, so committed upon the co-signing creditor; thus the case neither did, nor could, present a question as to the validity of the releasing clause. In the *Rex* v. *Watson et als.*, the assignment contained a like clause, the case directly presented the question of its validity, and the court sustained the instrument, but by a

*per curiam* decision, containing little more than its conclusion—a single reason,—namely, that, to disturb the assignment, would be to discourage a beneficial method of distributing an insolvent's estate; if the case was decided at common law, it is simply advisory to us (for no English decision, rendered after July 4, 1876, is authoritative to us), and, as advisory, it is of the feeblest character; an advisory decision of even extraordinary energy, which attempted to turn a current of law, that had been flowing in one direction for more than two centuries, would be unworthy of respect. *Rex* v. *Watson et als.* has been repeatedly and with great emphasis condemned in American courts. Burrill at page 156 of the second edition of his work on assignments, under the head of stipulations for release, says such stipulations continue to be inserted in the forms now used in England, referring to *James* v. *Whitehead*, reported in 20 L. J. Rep., N. S., 217, and 5 Eng., L. and E., 431; the case is not accessible to us, but we infer that it involved no decision on the subject, and whether it does or not is immaterial; such a form, is not a statute form, has no sanction in the English courts, as a common law instrument, earlier than 1816. We conclude that at the English common law, as it stood on July 4, 1876, this was a voidable assignment.

Both parties cite from the Federal courts. In *Pearpoint & Lord* v. *Graham, et al.*, 4 Wash. C. C., 232, decided upon the third circuit in 1818, the assignment called for a release; Judge Ware in *The Watchman*, Ware's Rep., 234, refers to it as supporting such an assignment, but Judge Story in *Halsey et al.* v. *Whitney et al.*, 4 Mason, 230, says that the case is not in point as a decision on the subject; and an examination of the case clearly justifies his remark; the instrument also contained a provision, that each creditor should release within sixty days; Pearpoint & Graham, a creditor firm, executed a release accordingly, and, the other creditors not having executed such release, brought the suit in equity for payment in full to the exclusion of the other creditors, making them parties, in order to cut

off their claims, and Graham, the assignee, he having accepted the trust; the defendant creditors were not parties to the contract, and therefore not entitled to its benefit, nor were they attaching it; it was valid between its parties, the Orators were one, and claiming its benefit, and in that only their right *inter parte* and the court decreed accordingly to the theory of the bill; in the opinion Judge Washington uses expressions, which taken abstractly may indicate that he considered such a condition in an assignment as valid against dissenting creditors, but interpreted by the points that required decision,—and this is a necessary index in the interpretation of a judicial opinion, by which to separate dictum from decision,—could only signify that the assignment bound its parties, for the present question was not before him. In *Halsey et al.* v. *Whitney el al.*, 4 Mason, 206, decided in 1826, upon the first circuit, the assignment was made in Massachusetts, and contained a condition of release, the suit was by a dissenting and attaching creditor, and the effect of the condition upon the validity of the instrument was thus directly presented. Judge Story by an exhaustive and unanswerable analysis of the principle, held that under a correct application of the statute the provision would avoid the assignment at the instance of a dissenting creditor, and that, uncontrolled by local considerations, and in the absence of general precedents, he should so apply it; but he sustained the instrument on the grounds of an equilibrium on the subject in the Massachusetts cases, of local usage and such precedents; so far as the decision was governed by the idea of usage, it recognized what he insisted upon as the correct interpretation of the statute, but a slight sounding will show that neither ground justified his departure from that interpretation.

As to the first ground, he refers to five cases, as showing that the question was in equilibrium in that state; of two of which he remarks in effect that the point was presented in them, but not raised or passed upon, and of the other

VOL. II.—11.

three that they *contained "intimations, which might well lead one to doubt if the court was prepared to admit the validity of such a stipulation:"* so that according to his own statement there had been no expression by the supreme court of the state for, but strong expressions by it against the stipulation, and therefore the cases in that state were not only not in equilibrium, but accorded with his own view of the principle.

As to the second ground, a local usage, to be capable of modifying the common law in a state, must so unmistakably exist, as to require no proof under an issue of fact, but must prove itself—that is, must enable the courts of the state to take notice of it without proof; and it would seem necessarily to follow, that it must be recognized, as such a usage, in the highest court of that state, before it can be recognized in any other court; this would seem to be a necessary result of the principle that the *lex loci* binds all other courts, the Federal as well; otherwise inevitable confusion would arise, and such other courts would be administering, as the law of a given place, a law not existing there; and this consideration is amply illustrated in the present instance, for one of the three cases, *Harris et al.* v. *Sumner*, 2 Pick., 129, mentioned by Judge Story as intimating strongly against the stipulation, was decided within three years prior to the decision of *Halsey et al.* v. *Whitney et al.*, showing that as late as that time the supreme court of the state knew of no such usage; and in *Bordin et al.* v. *Sumner*, 4 Pick., 165, the case of an assignment with a like stipulation, decided in October, 1826—though the remark, attributed by Judge Ware in *The Watchman*, at page 242 of Ware's Rep. to the court in the 4 Pick., as a declaration by that court that the question as to a stipulation for a release was reserved by it as unsettled, was not made by that court, and the real remark presented an entirely different consideration—that court (in 4 Pick.) did with unmistakable clearness hold that the question was unsettled in the state, and that it did not intend to deter-

mine it in that case, and thereupon assumed to decide the case upon another ground—and thus the United States circuit court, in the 4 of Mason, was recognizing, as a part of the *lex loci* of Massachusetts, the existence of a custom which the highest court in the state was then ignoring; these facts would seem sufficiently to indicate precipitancy on the part of the Federal court in placing its judgment upon the prevalence of usage; and if it be true, as stated by Judge Ware in *The Watchman*, the case of *Halsey et al.* v. *Whitney et al.*, was known to the profession, before that of *Bordin et al.* v. *Sumner* was decided, the latter case is an announcement of especial significance by the supreme courts of the state, that it was not yet prepared to accept the alleged usage, on which the 4 of Mason was based.

As to the third ground, on which Judge Story decided, the general precedents were *Rex* v. *Watson et al.*, and the case of *Lippincott et al.* v. *Barker*, 2 Binney, 174, decided in 1809; as to the latter, the assignment required a release within four months, was attached by a dissenting creditor, and thus presented the point directly; the court was composed of three judges, and the instrument was sustained, Mr. Justice Breckenridge dissenting; Silghman, C. J., who gave a majority opinion, remarking, " I beg, however, to be distinctly understood that my opinion is confined to the circumstances of the *present case*, for there are *many and strong objections* to deeds of assignment, made without the privity of creditors, and excluding all, who do not execute releases," and Yates, J., who gave the other majority opinion, remarking in reply to the argument that the condition was coercive, "I regret that we find such few instances of refined virtue in the payment of debts"; neither of the two precedents was authoritative to Judge Story, upon his own exposition of the statute, and statements of the views of the supreme court of Massachusetts; admiring the common law, as he did as a jurist, and bound by it, as he was as a judge, it is incomprehensible that he should have been influenced by the cases in the 3d of Price and 2nd of Bin-

ney, and to be regretted that he should have yielded his better judgment to the very superficial considerations that were allowed to govern it.    *The Watchman* was the case of an assignment, which required a release, and was attached by a dissenting creditor, and held by Judge Ware, in 1832, to be void, he adopting as his rule the interpretation which Judge Story had attributed to the statute, as the correct one.   In his opinion Judge Ware says that *Brad* v. *Viles et al.*, 2 Pet., 677, was the case of an assignment, impeached on grounds of fraud, one of which was that it required a release, that the decision was on a different point, *but that the court avoided the question, as one of doubt and difficulty;* we have no access to the case, as originally reported by Peters, and therefore do not know whether it justified the remark; but according to the case, as reported in Curtis' edition, vol. 8, at page 252, the decision simply followed the local construction of a local statute, and involved no question of fraud (and so far Judge Ware is correct), and, in confining the decision, Judge Story, who rendered the opinion, remarks: "this consideration saves us from the necessity of discussing many of the questions which have been so elaborately argued at the bar. If we were called upon to decide them from general principles, applicable to conveyances, which are assailed as being in fraud of creditors, we should have much difficulty in arriving at a conclusion upon some of the points, and should require further time for deliberation"; this is the only passage in the opinion, that relates to the subject of Judge Ware's remark, and did not justify it in the least.

In *Marsh & Compton* v. *Bennett et al.*, 5 McLean, 117, decided in 1846 in the district court of Michigan, the assignment created two classes of creditors absolutely, and further provided that, should any creditor sue upon his claim, it should pass into a third class, and that nothing should be paid upon that class, until the two prior classes had been paid in full; that no part of such costs, as he should reserve, should be paid, and of the debt claim only

the amount due at the making of the assignment; the suit was in the form of a creditor's bill by dissenting creditors, and the instrument was adjudged void. In 1833 in *Brashear* v. *West et al.*, 7 Pet., 608, the court sustained a like assignment, but only upon the ground that it was made in, and therefore to be construed by the law of Pennsylvania, which then allowed the condition for a release. Judge Marshall in the opinion said : " If this release were voluntary, it would be unexceptionable. But it is induced by the necessity arising from being postponed to all those creditors, who shall accept the terms by giving the release. It is not therefore voluntary." " The objection is certainly powerful, that its tendency is to delay creditors." " The weight of the argument is felt." " We are far from being satisfied, that upon general principles such a deed ought to be sustained." These remarks meant, and could only mean that at the common law or under the 13 of Elizabeth the instrument would be void; they are to us the highest authority short of a decision, as a statement that the entire court held that on general principle, that is, ungoverned by local law, the assignment would be void. Thus the Federal courts have with uniformity declared that the common law condemns an assignment that requires a release from the creditor upon a partial payment. Had we been in any doubt upon the subject before argument, which we were not, our duty would be to treat with respect such a concurrence of views in those courts, especially such unanimity in the supreme court of the United States ; though we do not mean to say that its views would govern us, except in the form of decision, or that the adjudications of the other courts of the United States rule us. Chancellor Kent, at page 534 of the second volume of his Commentaries says : " If the condition of the assignment be, that the share, which would otherwise belong to the creditor who should come in, and accede to the terms, and release, should on his refusal or default be paid to the debtor, or placed at his disposal by the trustees, it is deemed to be oppressive and

fraudulent, and destroys the validity of the assignment, at least against the dissenting creditors. "Mr. Burrill, having in the 13th chapter of his work on assignments, second edition, treated, at great length, of the release clause, in the 18th chapter summarizes the elements, which should appear upon the face of the instrument, to make it good at common law, into eight propositions; among which are the three following: "It must be for the benefit of the creditors, and not in any sense for that of the assignor, except as a necessary result, after all the creditors are satisfied; and to this primary object the property assigned should be faithfully and unreservedly appropriated, without any contrivance to embarrass or defeat its accomplishment. For this purpose—

"It must divest him of all title to the property conveyed, without reserving any portion for his own use, or any future benefit in the portion assigned, except in the shape of an ultimate residue or surplus, after all the debts are paid.

"It must be absolute and unconditional, imposing no coercive terms upon creditors for the advantage of the assignor, as the condition of receiving its benefits."

Treating these propositions as sound, an assignment which reserves any of its assets to the debtor, before full payment of creditors, vitiates the instrument, whether the reservation be provided for by coercive terms or not; an assignment which contains coercive terms, whether their aim is to provide a reservation or not, vitiates the instrument, *a fortiori*, if they do aim at a reservation.

Each party contends that the courts of the majority of the states agree with its view of the question.

We believe that that majority, and are confident that the greater portion of those of the state courts, whose decisions are deserving of the most respect, hold that the release clause vitiates the assignment; but, regarding the question of preponderance as entirely subordinate, we do not enter into a critical examination, to see what the fact is; we treat a consent of the states, or the striking of a numerical balance

upon their decision as inconclusive and insensible. Upon another occasion we have said that the decisions of the state courts of this country can be considered by us as illustrative, not as determinative of the common law—akin to that we adopt, as a necessary proposition, the further rule that, when authoritative adjudications differ, elementary principles must determine,—and not the less, if the adjudications are advisory. Judge Ware thus stated it in, and by it decided the case of *The Watchman*,—" *if the authorities leave the question in suspense, the elements of a decision must be drawn from the general and acknowledged principles of law, as applied to the provisions of the assignment.*" It is an axiomatic principle, acknowledged, as we believe, in every court sitting at common law, the application alone of which has led to difference of opinion,—a principle which we cannot conceive that any intelligent authority, either case or commentary, would question,—that the debtor cannot prefer himself to the creditor in respect to the assets, and a provision which tends to secure, is a provision which does not secure that preference; upon either of the three interpretations, above defined, which may be put upon the present dividend clause, the direct tendency or effect of the clause is to secure a return to the assignor of more or less of the present assets, before the creditors have been paid; were we unaided by the views of the Federal courts— were those courts silent upon the subject, we would be compelled to declare, and we declare this assignment void.

The appellees contend that, if the instrument exhibits on its face constructive fraud, that feature is overcome by proof that there was no fraud in fact. But the one description of fraud does not imply the mere existence of the other; the instrument is plenary and conclusive evidence of fraud in law, and estops its parties from alleging good faith in fact against its import; and fraud in law is as fatal as is fraud in fact. .

Our objection to the instrument proceeds wholly upon the ground of fraud by construction of law; and it is due

to the appellees and to their counsel to say that the only defect which we discover in it, is in the condition for a release; and that such a condition is sanctioned by numerous, though our duty requires us to say unsound precedents.

The appellees contend that, if the instrument must stand as affected by constructive fraud, equity will sever the elements of fraud from the text, and give effect to the rest, the same as if that element had not been in it; so that in this case the court will treat the present condition of release as a nullity, enforce the residue of the dividend clause, as it would if originally free from the condition, and distribute the assets equally among creditors, the assenting and dissenting alike.

But equity has no power to reconstruct a trust created by contract, and substitute its will for that of the parties. That would be for the court to impose its contract upon the parties, as thus it must enforce the trust, as it finds it, or hold it to be void; sustain or vacate it *in toto*. The rule at law and in equity is to treat the assignment, if fraudulent, as void *in toto*; acting upon the same principle, the two jurisdictions differ only in their method.

A different principle would more than violate the rule, that the court cannot make contracts for parties; it would flatly conflict with the statute of Elizabeth, and encourage insolvents to experiment in the chances of fraud.

Each Orator has obtained a judgment, and no question arises as to whether he must have so liquidated his original claim, before resorting to equity for relief against the assignment. But it must appear that he has no remedy at law for the collection of his judgment, before equity will assist him to collect it from the assigned fund. Upon the two earlier judgments executions were duly issued, and duly returned, "no property found," so that as to them it is apparent that there is no remedy at law; had the executions not been issued, the fact that, before those two judgments were rendered, the debtor's entire assets had passed under the assignment into the possession and control of the

assignees, and have since been retained by them under the claim of paramount title, as so derived, would have made it as apparent that there was no remedy at law, as it was made by the return of unsatisfied executions; it is therefore apparent that there is no remedy at law on the third judgment.

The learned counsel for the appellees urged upon us with much emphasis, that, to sustain the appeal, and pay the Orators in full out of the fund, leaving to the assenting creditors, who constitute the mass of the creditors in number and amount, the small remaining dividend, would be an "*outrage*." The latter creditors, by uniting in the assignment, waived their exemption from it, and conferred that preference upon the Orators: To deprive them of that rightful preference, would be an arbitrary proceeding, to which the extreme language of the counsel might properly apply. We reverse the decree of the district court.

The assignees have fraudulently withheld the assets of Wanless from the Orators, and to an amount, allowing the assignees their claim for deductions, exceeding the demands of the Orators, and have thus charged themselves with those demands. That claim for deductions is not treated by us as necessarily allowable against dissenting and diligent creditors. The assignees under a fraudulent assignment can be allowed nothing for services; and for expenses only what is reasonable; a different principle would encourage such assignments. We speak of the net fraud, admitted by them as sufficient to charge them with the demands of the Orators, simply because it thus renders an inquiry into the justice of the claim for expenses, unnecessary. A decree should be entered, decreeing to each Orator the amount of his judgment, with interest to August 15, 1879, and to the Orators a single bill of costs below and above against the three defendants; and that within thirty days from that date the defendants pay the amount, so decreed, to the Orators, and interest thereon from that date, to the clerk of the second district court in satisfaction of this de-.

cree, and that that clerk pay the same over to the Orators, their attorneys or solicitors, according to the respective rights of the Orators.

Decree reversed.